**A&W SMELTER AND REFINERS, INC., Plaintiff,**

v.

**William J. CLINTON, et al., Defendants.**

No. C–96–1374 SI.

United States District Court, N.D. California.

March 25, 1997.

Matthew J. Nasuti, McQuaide Metzler McCormick & Van Zandt, San Francisco, CA, for Plaintiff.

Karen L. Egbert, Environmental Defense Section, Land & Natural Resources Div., Washington, DC, Patrick R. Bupara, Asst. U.S. Atty., Michael J. Yamaguchi, U.S. Atty., U.S. Attorney's Office, San Francisco, CA, Lois J. Schiffer, U.S. Dept. of Justice, Environmental & Natural Resources Div. General Litigation Section, Washington, DC, for Defendants.

## ORDER GRANTING SUMMARY JUDGMENT AND DENYING LEAVE TO AMEND THE COMPLAINT

ILLSTON, District Judge.

On March 14, 1997, the Court heard argument on defendant's motion for summary judgment and plaintiff's motion to file an amended complaint. Having considered the arguments of counsel and the papers submitted, the Court hereby grants defendants' motion for summary judgment and denies plaintiff's motion to file an amended complaint.[1]

## BACKGROUND

This action is an appeal, from the Environmental Protection Agency's Environmental Appeals Board decision to deny two petitions by plaintiff A&W Smelters for reimbursement of costs incurred in complying with two administrative cleanup orders[2] issued by the EPA under section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9606(a).

The material that is the subject of the lawsuit, sometimes referred to as "Ore Pile # 2," originated at the A&W mining claim located in Santa Fe Springs, CA (Kern County), on land leased from the United States Bureau of Land Management. Beginning in 1988, A&W had been issued numerous no-

tices and citations regarding unsecured waste piles, including notices of violations of state hazardous waste regulations by the California Department of Toxic Substances Control. Def. Exhs. 3, 4, 5, 6, 8. On September 11, 1992, A&W was ordered by the Bureau of Land Management (BLM) to remove all ore and barrels from its site by October 16, 1992. Thereafter, A&W entered into an agreement with Roelof Mining Company in Baja, Mexico to transport the material from the A&W site in California to Baja, Mexico.

### Bergstrom Site (Order 93–03)

The first cleanup order (93–03) related to the Bergstrom Site. Six truckloads of material that A&W had attempted to ship to Roelof were not allowed to pass from California into Mexico. The loads were then transported first to the yard adjacent to Russell Deupree's residence in Escondido, CA., and then to the property adjacent to David Bergstrom's residence in Sandy Valley, Nevada (the Bergstrom Site). The material was dumped in the Bergstrom yard in unsecured, exposed piles.[3]

EPA's Technical Assistance Team ("TAT") visited the Bergstrom Site on December 4, 1992. Based on the findings of the TAT and tests of the material found at the Bergstrom Site, on December 17, 1992 the EPA issued CERCLA Order 93–03, directing A&W to clean up the Bergstrom Site. In response, A&W shipped the material to an authorized disposal facility.

### The AP Site (Order 93–06)

The Applied Technologies or AP Site involved material from the same origin as the Bergstrom Site. In late 1992, A&W attempted to send seven truckloads of the material to Mexico for processing by Roalof. Four trucks were impounded by U.S. Customs and tested by the County of San Diego Hazardous Materials Team. Elevated levels of lead

---

1. At oral argument, counsel for plaintiff and was granted leave to file a Supplemental Brief on the Regulatory Status of Lead and Lead Mixtures, which it did on March 17, 1997. Defendants filed a Response to the supplemental brief on March 20, 1997.

2. The two administrative cleanup orders are 93–03 (relating to the Bergstrom Site) and 93–06 (relating to the Appropriate Technologies or "AP" Site)

3. The Bergstrom Site was a residential area, approximately 100 feet from the Bergstrom home where three small children lived.

were found in the samples. U.S. Customs sent the trucks to the L&Z trucking facility for temporary storage. The other three truckloads were detained by Mexican authorities and repatriated to the United States on January 14, 1993.

EPA was originally going to allow A&W to transport the material back to A&W's facilities until the material could be properly disposed of. However, A&W was unable to secure transportation for the material, and was informed by the EPA that if A&W did not assume custody of the material when it was returned to the U.S. on January 14, 1993, it would be considered abandoned. On January 15, 1993, the EPA issued Order 93–06 directing A&W to assume responsibility for the proper disposal of the seven truckloads of material which was temporarily being stored by U.S. Customs at the AP facility. A&W complied with the order by shipping the material to an approved disposal facility.

In the present action, A&W has filed a complaint alleging that it is not liable for the cleanup costs incurred and that is should therefore be reimbursed pursuant to section 106(b)(2)(C) of CERCLA. In addition, plaintiff alleges that even if it is a liable party, the EPA's decision to issue cleanup orders 93–06 and 93–03 was arbitrary and capricious or otherwise not in accordance with the law, so plaintiff should be reimbursed pursuant to section 106(b)(2)(D) of CERCLA.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (the nonmoving party may not rely on the pleadings but must present significant probative evidence supporting the claim); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505,

2510, 91 L.Ed.2d 202 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The court's function, however, is not to make credibility determinations, *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11, and the inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec.* Serv., 809 F.2d at 631.

## DISCUSSION

CERCLA provides a comprehensive statutory scheme for the cleanup of releases or threatened releases of hazardous substances and for the imposition of the costs of those cleanups on the responsible parties. 42 U.S.C. § 9601 *et. seq.* CERCLA provides that the EPA shall issue an administrative order to abate when the EPA determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance. 42 U.S.C. § 9606(a). CERCLA imposes liability for cleanup on responsible parties, including any person who by contract, agreement, or otherwise arranged for disposal or treatment of hazardous substances. 42 U.S.C. § 9607(a)(3). Under CERCLA section 106(b), any person who receives and complies with an EPA cleanup order under section 106(a) may seek reimbursement for cleanup costs by petitioning the President for reimbursement for reasonable costs of such action, plus interest. 42 U.S.C. § 9606(b)(2)(A)

There are two ways a petitioner may claim entitlement to reimbursement: 1) by establishing, by a preponderance of the evidence, that petitioner is not liable for the response costs under section 107(a) of CERCLA and that the costs for which reimbursement is sought are reasonable in light of the cleanup order (42 U.S.C. § 9606(b)(2)(C)); or 2) if petitioner is liable for response costs under section 107(a), petitioner may still recover reasonable costs, if petitioner can demonstrate on the administrative record that the President's decision (through the EPA) in selecting the response action was arbitrary and capricious or otherwise unlawful (42 U.S.C. § 9606(b)(2)(D)).

Plaintiff in the instant case is seeking reimbursement for its compliance with Orders 93–03 (Bergstrom Site) and 93–06 (AP Site) The first assertion in A&W's complaint is that it is not a liable party under CERCLA because (a) the material subject to the orders was not a hazardous substance; (b) there was no release or threat of release of a hazardous substance; and (c) because the material was valuable mining ore, A&W did not arrange for the disposal or treatment of hazardous substances within the meaning of CERCLA. Secondly, A&W asserts that, even if it was a liable party under CERCLA, the EPA's decision to issue Response Orders 93–03 and 93–06 was arbitrary and capricious. Each of these arguments will be addressed by the Court in turn.[4]

### A. *Defendants' Motion for Summary Judgment*

#### 1. *A&W Is a Liable Party*

#### a. *Hazardous Substance*

In the instant case, the EPA contends that the A&W material was a hazardous substance within the definition of CERCLA because it contained elevated levels of lead.[5] A&W disputes this finding on two grounds: (1) that the material is not a hazardous waste, and as such not subject to CERCLA; and (2) that the material has a marketable value as mining ore and as such is not subject to CERCLA.[6]

CERCLA authorizes responses to hazardous substances. There are six categories for designation of a substance as a hazardous substance under CERCLA,[7] one of which is materials designated as hazardous under RCRA.[8] A&W argues that because its material is not considered a hazardous waste under RCRA, then it is beyond the scope of regulation by CERCLA. However, that assertion is not supported by the statute. Identification as a "hazardous waste" under RCRA is only one category of identification as a hazardous substance under CERCLA. § 9601(14)(A).[9] The EPA asserts that A&W's material meets two of the definitions of "hazardous substance" under CERCLA because lead is defined as both a hazardous

4. As a preliminary matter, A&W has raised numerous objections to the evidence submitted by the EPA in support of its Motion for Summary Judgment. A&W's primary objection is that the EPA exhibits are inadmissible hearsay. The Court finds this objection to be without merit. Most of the EPA documents on which the government relies are government records produced in accordance with a regularly conducted activity, and thus are admissible under the business records exception to the hearsay rule. Fed. Rule of Evid. 803(6). The hearsay objection to Exhibit 7 is also without merit. Exhibit 7 was produced by A&W in the course of discovery and is signed by A&W's principal, Daryl Westerfield; it is admissible either as a business record under FRE 803(6), or as a statement against interest under FRE 804(b)(3) because it identifies the material as a hazardous waste. Defendants have agreed to withdraw Exhibit 14 because of A&W's objection to the translation of that document.

5. Lab tests by the EPA on samples from the Bergstrom Site indicated that the lead concentration in the material ranged from 6,000 ppm to over 10,000 ppm. Normal soil levels usually range from 500 to 600 ppm; lead concentrations at the sampled level pose a significant health hazard. E.P.A. Order 93–03. Samples taken from the AP Site and tested by the EPA revealed lead concentrations in excess of 20,000 ppm. In addition, elevated concentrations of zinc and copper were detected along with concentrations of polychlorinated biphenyls (PCBs). E.P.A. Order 93–06.

6. A&W does not appear to contest the existence of lead in the material. Its argument appears to be that even though dangerous levels of lead may have been present, this material was still a valuable mining ore and therefore not a hazardous substance subject to regulation under CERCLA.

7. The term "hazardous substance" is defined as (A) any substance designated pursuant to § 1321(b)(2)(A) of Title 33 (RCRA), (B) any element, compound, mixture, solution or substance designated pursuant to § 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to § 3001 of the Solid Waste Disposal Act, (D) any toxic pollutant listed under § 1317(a) of Title 33, (E) any hazardous air pollutant listed under § 112 of the Clean Air Act, and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to § 2606 of Title 15. 42 U.S.C. § 9601(14).

8. RCRA is the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901–6992k.

9. Plaintiff argues at some length that the definition of the term "hazardous waste" under RCRA is "nebulous." However, as noted above a

substance pursuant to section 102 of CERC-LA (meeting § 9606(14)(B)) and as a toxic pollutant listed under § 1317(a) of Title 33, The Clean Water Act (meeting § 9606 (14) (D)). The presence of lead in the material makes it a hazardous substance, and thus subject to CERCLA liability.[10]

■ A&W's further argument regarding the quantity of hazardous substance contained in the material is also misplaced. It is not the quantity of the hazardous substance in relation to the other material in the sample, but the presence of the hazardous substance that gives rise to CERCLA liability. *See B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1201 (2nd Cir.1992) (when a mixture contains hazardous substances, that mixture is itself hazardous for purposes of determining CERCLA liability).[11]

■ A&W next contends that because it considered the material to be a valuable mining ore, based upon what it alleges were recoverable amounts of gold and silver in the

material, it is beyond the scope of CERCLA. However, the marketability of a substance is not a factor in determining whether it is a "hazardous substance" under CERCLA., The determination that a material is a "hazardous substance" is made under § 101(14) of the Act. Therefore, A&W's assertion that the material is a valuable mining ore, even if true, would not preclude their liability under CERCLA.[12]

### b. *Release or Threat of Release*

In order for CERCLA liability to attach, there must be a release or threatened release of a hazardous substance. A release is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22).

RCRA-defined hazardous waste is only one of the definitions of a hazardous substance under CERCLA. Any relief for the plaintiff must come from CERCLA. A similar argument was rejected in *State of California v. Summer Del Caribe,* 821 F.Supp. 574, 580 (N.D.Cal.1993), which held that "the explicit language of CERCLA, the apparent intent of the drafters, and the distinct purposes of CERCLA and [RCRA] compel the conclusion that a substance need not be a 'hazardous waste' under [RCRA] for liability under CERCLA to attach."

10. In its supplemental briefing filed after oral argument, A&W argued that the EPA failed to designate the type of lead present in the material at both sites and that this failure precluded liability under CERCLA. The Court finds this assertion to be without merit. CERCLA does not require a finding of such specificity in order for liability to attach. The Ninth Circuit has held that a finding of the presence of lead in a substance fulfilled the requirement of a hazardous substance under CERCLA without a finding concerning the specific type of lead. *Catellus Dev. Corp. v. United States,* 34 F.3d 748, 752 (9th Cir.1994); *Louisiana–Pacific Corp. v. ASARCO, Inc.,* 24 F.3d 1565, 1573 (9th Cir.1994); *New York v. Exxon Corp.,* 766 F.Supp. 177, 181–2 (S.D.N.Y.1991) (substantive listing of lead and lead compounds under CERCLA meant that any type of lead was a hazardous substance under CERCLA).

11. Although the EPA found substantial levels of lead in the material, there is no specific thresh-

old level of hazardous substance giving rise to CERCLA liability. Therefore, A&W's argument that it is not liable because the EPA failed to establish an action level for the amount of lead found in the material lacks merit. *See U.S. v. Wade,* 577 F.Supp. 1326 (E.D.Pa.1983) (all the government must show in order to find CERCLA liability is the presence of an unspecified quantity of substances designated as hazardous under the Act); *Atlantic Richfield Co. v. Blosenski,* 847 F.Supp. 1261 (E.D.Pa.1994) (CERCLA liability did not depend on the presence of some minimum threshold of hazardous substance).

12. Because A&W's contention that the hazardous materials had value would not render them any less hazardous for these purposes, it is not necessary to make a finding on this point. However, the undisputed facts cast considerable doubt on the "value" argument. The materials dumped at the Bergstrom Site and hauled to the AP Site both originated in Ore Pile # 2, most of which had been sent to A&W and dumped on its property in the 1960's. A&W had never processed the materials, because the cost of processing exceeded the value of the metals. Over the ensuing 30 years, other waste materials were dumped on and mixed with the materials in Ore Pile # 2, and it was this mixture which the authorities ultimately ordered A&W to dispose of. Indeed, A&W itself had attempted to dump these same materials as waste at a landfill; it was only after having been refused access to the landfill on account of the materials' hazardous contents that A&W entered into its agreement with Roelof in Mexico.

A&W's assertion on this point is unclear, but it seems to be related to the first assertion that the material in question was not a hazardous substance. However, as discussed above, the material at both the Bergstrom and the AP Sites has been established as a hazardous substance under CERCLA.

■ As, to the Bergstrom Site, EPA reports indicate that the material was unsecured and located in an unfenced pile in the corner of the Bergstrom residential property. EPA Order 93–03 at 3. Wind was observed to be blowing particles from the piles of material. *Id.* at 5. In addition, the report generated by the Tactical Assistance Team which did the testing on the site notes that the Bergstrom children had been playing in the pile of material for approximately one week. Def. Exh. 11 at 2. Under the definition of release quoted above, there is no question that the unsecured pile containing a hazardous substance was actually escaping or was threatening to escape into the environment.

■ As to the AP Site, the EPA contends that A&W abandoned the materials, which is treated as a release under 42 U.S.C. § 9601(22). A&W argues that because it considered the material valuable as mining ore, it did not intend to abandon the AP material at the border. On January 11, 1993 the EPA notified A&W that the three truck loads of material that had been impounded by the Mexican Customs Service would be returned to the United States on January 14, 1993. Def. Exh. 13 at 3. A&W was notified that if it .did not arrange for transportation and assume custody of that material on January 14, it would be considered abandoned. *Id.* at 4. Because A&W did not assume custody of the material on January 14, the EPA considered it abandoned and transported the material to a federally approved treatment, storage and disposal facility. *Id.* at 5; Def. Exh. 15 at 1–2. Thus, A&W's failure to claim possession of the material when it was returned to the United States constituted a release under CERCLA (abandonment of barrels or containers is considered a release). 42 U.S.C. § 9601(22).

### c. *Arranger Status*

■ In order for liability to attach to A&W under CERCLA, A&W must by contract, agreement, or otherwise arrange for disposal or treatment of a hazardous substance, or arrange with a transporter for disposal or treatment of hazardous substances owned or possessed by such person. 42 U.S.C. § 9607(a)(3). A&W argues that it was not arranging for the disposal of a hazardous substance and therefore not liable under CERCLA. A&W seeks to invoke the doctrine of "useful products" [13] in support of its argument that because the material had a marketable value as mining ore, it was not arranging for the disposal of a hazardous substance.

However, this characterization of a material as a "useful product" has been specifically rejected. In analyzing whether a material is actually a "useful product", courts go beyond the defendants' characterization of the substance. *See United States v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373, 1381 (8th Cir.1989); *State of California v. Summer Del Caribe, Inc.*, 821 F.Supp. 574, 581 (N.D.Cal.1993). A&W concedes that the material at the Bergstrom and AP Sites was not a "useful product" in its present state. In order to extract what A&W alleges to be valuable minerals (gold and silver), the material would have to be subjected to a heap leaching process, which would still leave a by-product requiring disposal.

■ The *Summer Del Caribe* court rejected the characterization as a "useful product" of a material that needed further processing in order to be considered valuable, stating "[C]ourts have rejected the sale of a

---

**13.** A transaction involving the sale of a "useful" product—and thus beyond the scope of CERCLA liability—is one in which "the sale is of a new product, manufactured specifically for the purpose of sale, or of a product that remains useful for its normal purpose in its existing state." *State of California v. Summer Del Caribe, Inc.*, 821 F.Supp. 574, 581 (N.D.Cal.1993). Products such as PCB-filled transformers and asbestos-containing building supplies are materials that have been considered useful products, even though they contain hazardous substances. *See Prudential Insurance Co. of America v. United States Gypsum*, 711 F.Supp. 1244, 1245 (D.N.J. 1989); *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313 (11th Cir.1990).

useful product defense when the purpose of the sale is to get rid of or treat a waste or by-product." *Id.* at 581 (citations omitted) The material that A&W now argues is valuable mining ore is a combination of materials dumped on Ore Pile # 2, including by-products that were created during the operation of A&W's mine. The material does not have any value in its present state. In *Summer Del Caribe* the Court found that the defendant's only option was to "dispose of the solder dross itself, reclaim the usable portion and dispose of the hazardous substance, or transfer it to a third party. In choosing the third option, Defendant, thus arranged for treatment and disposal under CERCLA." *Id.* at 582. A&W was faced with the same options and chose to transfer the material to Roelof. Therefore, following *Summer Del Caribe,* this Court is not persuaded by A&W's attempt to characterize the transfer of these materials to the Roelof facility as a sale of a useful product.

### 2. *Arbitrary and Capricious*

■ The arbitrary and capricious standard of review is very narrow. Agency actions are presumed valid and upheld if they satisfy minimum standards of rationality. *Ethyl Corp. v. EPA,* 541 F.2d 1, 34 (D.C.Cir.) (*en banc* ), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 2663, 49 L.Ed.2d 394 (1976). A selection of a response action will be upheld as long as it is supported by facts in the administrative record and is not based upon legally impermissible considerations. *Motor Vehicle Manufacturers Association v. State Farm Mutual Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). In addition, the determination of arbitrary

and capricious action on the part of the EPA must be determined solely on the administrative record.[14]

■ A&W's argument is that because it considered the material to be valuable mining ore, the material was beyond the scope of CERCLA and thus no action was necessary on the part of the EPA. By acting in a situation in which no action was necessary, the EPA acted in an arbitrary and capricious manner. As discussed above, the EPA was justified by CERCLA in issuing the Response Orders. The Administrative Record contains the Action Memo detailing the EPA findings at both locations and copies of lab reports that state the level of concentration of hazardous substances found in the materials. A&W offers no explanation as to why, based on these records, the action of the EPA in issuing Orders 93–03 and 93–06 should be deemed arbitrary and capricious. As such, this argument by the plaintiff is without merit.

Plaintiff also argues that the EPA was without legal authority to promulgate Orders 93–03 and 93–06 and additionally, in issuing those orders, the EPA failed to allege that they had legal authority to do so. Both of these arguments are without merit. CERCLA provides the EPA with statutory authority to order an abatement when there is an "imminent and substantial danger to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance." 42 U.S.C. § 9606(a). In addition, both Orders issued to A&W by the EPA contain an introduction which provides the legal authority on which the EPA action is based.[15] For these reasons, the

14. Plaintiff argues that there is no agreed upon Administrative Record before the Court, and that this is a procedural defect, precluding summary judgment. The Administrative Records applicable to this case have been known to A&W since their hearing before the Environmental Appeals Board. In addition, copies of the Administrative Record are included as Exhibits 21 and 21 to Defendant's Motion for Summary Judgment. A&W has never moved this Court to amend or to strike any portion of the Administrative Record. Therefore, the Court finds that this assertion is without merit.

15. "This Administrative Order is issued on this date to the Respondent, pursuant to the authority vested in the President of the United States by Section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9606(a), as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub.L. 99–499, delegated to the Administrator of the United States Environmental Protection Agency by Executive Order No. 12580, January 27, 1987, 52 *Federal Register* 2923, further delegated to the EPA Regional Administrators by U.S. E.P.A. Delegation Nos. 14–14–A and 14–14–B, and further redelegated to the Director, Hazardous Waste Management Di-

Court finds that A&W's allegation that the EPA is without legal authority to promulgate abatement orders under CERCLA is without merit.

### B. *Motion to Amend Complaint*

Federal Rule of Civil Procedure 15(a) provides for the amendment of pleadings by leave of court and notes that such leave "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). However, the grant or denial of a motion to amend is committed to the discretion of the district court, and denial is proper where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *see also Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 772 (9th Cir.1991). An amendment is considered futile where the added claim could be defeated by a motion to dismiss or for summary judgment. *See Wilson v. American Trans Air, Inc.*, 874 F.2d 386, 392 (7th Cir.1989).

Although this case is set for trial on April 7, 1997, plaintiff has filed a Motion to Amend its complaint. The amended complaint is significantly similar to the original complaint except for the fifth cause of action for declaratory relief. Plaintiff has modified all of its requests for declaratory relief, stating that the primary purpose in seeking declaratory relief "is an attempt to forestall, streamline or (preferably) eliminate three other federal lawsuits, which appear to be inevitable between the parties." Pl. Motion at 2. The new issues for which A&W seeks declaratory relief are independent of their reimbursement claims.

■ Defendant opposes this Motion on two grounds. EPA asserts that the new claim of declaratory relief should be barred because in essence it is asking the Court for an advisory opinion to solve issues that it may claim in other lawsuits. The claims for which plaintiff is seeking declaratory relief are inapplicable to the instant case. It is established that courts lack jurisdiction to issue advisory opinions that do not affect the rights of the parties in the case at hand. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937). Because the plaintiff seeks to change the allegations in the fifth cause of action to aid in the determination of other lawsuits, their resolution in the context of this case is improper.[16]

■ Secondly, the EPA argues that it would be prejudiced by the new allegations in the fifth cause of action because they are no longer duplicative of the first four causes of action. Trial could not go forward as scheduled, substantial delay would be caused, and defendant argues that it would be required to file an additional summary judgment motion to address those changes. *M/V American Queen v. San Diego Marine Const. Corp.*, 708 F.2d 1483, 1492 (9th Cir. 1983) (motion to amend properly denied where plaintiff failed to allege new facts and dispositive motion was pending and disposition of case would be delayed by granting leave to amend) Thus plaintiff is denied leave to amend its complaint.

### CONCLUSION

For the foregoing reasons and for good cause shown, defendants' Motion for Summary Judgment is GRANTED; and plaintiff's Motion For Leave to File an Amended Complaint is DENIED.

IT IS SO ORDERED.

### JUDGMENT

In accordance with the Court's Order of March 24, 1997, judgment is hereby entered in favor of defendants and against plaintiff.

IT IS SO ADJUDGED.

---

vision by Region IX Delegations 1290.41 and 1290.42." E.P.A. Order 93–06, Def. Exh. 13.

**16.** These issues could, of course, be raised in a separate action provided that they are timely.